COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| TEXAS DEPARTMENT OF AGING and DISABILITY SERVICES, | § | No. 08-23-00177-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law Number Three |
| CLAUDIA GOMEZ, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2016DCV4116) |
| | § | |

## **MEMORANDUM OPINION**

The El Paso State Supported Living Center (the Center) terminated the employment of Claudia Gomez because it concluded she physically assaulted a coworker. Alleging that the real reason was age, gender, and disability discrimination, Gomez sued the state entity that runs the Center, the Texas Department of Aging and Disability Services (DADS).[1]

DADS filed a plea to the jurisdiction, which the trial court denied as to Gomez's discrimination claims. For the below reasons, we agree with DADS that Gomez failed to establish a prima facie case in support of these claims. And even assuming otherwise, Gomez failed to present sufficient evidence that the nondiscriminatory reason given by DADS for her

---

[1] The Texas Health and Human Services Commission took over DADS's operations in 2017. *See* Tex. Gov't Code Ann. §§ 531.0202(b) and 531.02001(2)(B) (abolishing DADS and transferring its functions to the Texas Health and Human Services Commission). The pleadings and orders below still refer to DADS, so we do the same in this opinion.

termination—that she physically assaulted a coworker—was a pretext. We therefore reverse the trial court's ruling on Gomez's age, gender, and disability discrimination claims and render judgment dismissing these claims for lack of jurisdiction.

## I.  BACKGROUND

### A.  Factual background

The Center is home to around 100 residents with mental and developmental disabilities and provides them with direct care and services, including prepared meals. Gomez began working there as a Cook II in 2007.

### (1)  The incident

The incident at issue occurred in the Center's kitchen on the morning of July 30, 2014. Gomez describes the incident as a verbal altercation between her and a coworker, Robert Campos. Gomez's same-day, handwritten statement tells her side of the story:

> I arrived at 11:25 am and I asked Roberto [Campos] why did he leave the day before without waiting for me because I was in Systems and I finished serving dinner at 7:12 p.m. and that is why I was running late; and when I arrived it was 8:38 pm and there was no one in the kitchen. That is why he was upset and he started to complain that the prep for today's dinner was not ready. I told him, Robert, it's that you could have done it yesterday because all you did all day was mash the beans and prepared the fiesta corn for the Regular/Chopped textures. That is when he got angrier and told me that I better get prepared to get my salary reduced.

> Mary Gallegos heard him and I told her, look at him, he is yelling at me. Maria said I don't know anything and left. Then I told him, maybe the one that needs reduced pay is someone else because you say you make a lot but if you are so secure in the cottages why do you go to the ones that are being served? That is when he got angrier and he got closer to me and pointed his finger at me and told me that I was a dried up rattlesnake and that is why I didn't have any children; and that it would give him great pleasure that my generation would end with me. I then did not respond to him.

In her deposition, Gomez denied making physical contact with Campos at any point during the incident.

2

Campos describes the incident differently, claiming that at one point Gomez "grabbed [him] by [his] two arms." His same-day, handwritten statement tells his side of the story:

> I came to work at 11:30 a.m. on 07/30/14. Claudia Gomez confronted me mad telling me why didn't I waited for her yesterday. The impres[s]ion on her face was like bitter and angry. I told her it was eight-thirty already. And no need to put overtime. She started telling me with loud voice. Unappropriate things. Like I'm lazy, that I look like a homosexual, that I look like a woman. And that everybody [k]nows that the State serves food for me. I told her to stop talking and get to work that's why your getting paid for[,] not to be gossiping all over the State Center like your use too. Then she got mad and grabbed me by my two arms and wanted to slap me or hit me on my face, but I released my arms and run. Claudia was following me around the kitchen. And told me that I was goin[g] to get it. Telling me that she was goin[g] to get me fired. That she has a lot of influences. This happened in the kitchen near the steamers. Maria Gallegos was witness to just the argument. Because Maria left to serve 507.

Although this statement does not mention Campos calling Gomez a dried-up rattlesnake, he later admitted in his deposition that he did so.

### (2) The investigation

The incident was investigated by the Office of Inspector General (OIG), which concluded that "[t]he allegation that [Gomez] assaulted [Campos] by grabbing him by the arms causing a thumb size bruise on each arm is substantiated."

OIG Investigator Efrain Sianez interviewed Gomez, Campos, and other witnesses, several of whom stated they saw marks on Campos's arms on the day of the incident. Among these witnesses was Pamela Richter, D.O., a doctor at the Center's medical clinic, who examined Campos on the day of the incident. Richter stated that Campos had "bilateral contusions to his arms" that "looked like thumb prints consistent to what [he] was saying," i.e., he had been "grabbed by a co-worker." Sianez also reviewed a photograph of Campos's left forearm taken by Campos with his cell phone after the alleged incident. According to Sianez, the photograph depicts "[an]

3

injury [that] appears to be circular in shape and resembles a thumb print."[2] Because no eyewitnesses (other than Gomez and Campos) were identified, and the Center's kitchen had no video cameras, Sianez's conclusion relied in part on his assessment of Gomez's and Campos's credibility.

### (3) The termination

DADS sent Gomez a "Notice of Possible Disciplinary Action" on November 17, 2014, notifying her that the OIG investigation had substantiated the allegations and offered her an opportunity to submit a rebuttal letter.

Gomez submitted a rebuttal letter repeating her account of the incident and adding, among other things, that "I couldn't have administered those markings to Mr. Campos since I have no strength to m[y] hands," "I am on workers compensation because of a previous injury," and "Doctors have evaluated the strength of my hands and honestly I barely have enough strength to open a pickle jar."

DADS sent Gomez a "Notice of Final Disciplinary Action" on December 8, 2014, terminating her employment with the Center effective the same day.

### B. Procedural history

Gomez filed two charges of unlawful discrimination with the Texas Workforce Commission Civil Rights Division. The first charge was based on age (she was born in 1962) and disability (allegedly arising from her 2012 hand injury). Her second charge was based on sex/gender. After receiving a right-to-sue letter, Gomez filed this lawsuit, pleading age, gender,

---

[2] Neither Richter nor Sianez could rule out the possibility that the marks on Campos's arms might have been self-inflicted. When asked about that scenario, Richter stated "[a]nything's possible" and "I really can't make a call on that. I'm sorry." Sianez testified "I don't know how they could have determined that."

and disability discrimination.[3] After DADS filed an answer and the parties engaged in extensive discovery, DADS filed a plea to the jurisdiction, arguing that the jurisdictional evidence did not show Gomez was terminated for any unlawful reason, and instead showed she was terminated because it was determined that she physically assaulted Campos. As a result, DADS claimed its sovereign immunity remained intact and the trial court lacked jurisdiction. Gomez responded, arguing that there was sufficient jurisdictional evidence to support her claims, thereby establishing waiver of DADS's immunity. Both parties submitted several exhibits in support of their positions.

The trial court denied DADS's plea to the jurisdiction as to Gomez's age, gender, and disability discrimination claims, and DADS filed this interlocutory appeal.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Plea to the Jurisdiction

State agencies like DADS "are immune from suit and liability in Texas unless the Legislature expressly waives sovereign immunity." *Tex. Health & Hum. Services Comm'n v. Pope*, 674 S.W.3d 273, 280 (Tex. 2023). The Legislature has waived sovereign immunity for discrimination claims under Chapter 21 of the Texas Labor Code, also known as the Texas Commission on Human Rights Act (TCHRA). *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). That waiver, however, extends "only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Id*.

Sovereign immunity may be asserted in a plea to the jurisdiction. *Pope*, 674 S.W.3d at 280. Such a plea may "'challenge[] whether the plaintiff has alleged facts that affirmatively demonstrate

---

[3] Gomez also pleaded hostile-work-environment and later a retaliation claim. The trial court dismissed these claims with prejudice which is not challenged on appeal.

5

the court's jurisdiction to hear the case,' 'the *existence* of those very jurisdictional facts,' or both." *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (citing *Mission Consol.*, 372 S.W.3d at 635) (emphasis in original). When the existence of jurisdictional facts is challenged, "we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Pope*, 674 S.W.3d at 281. This analysis involves a question of law we review de novo and mirrors our evaluation of a traditional motion for summary judgment. *Id*. at 280–81.

In other words, a state agency asserting sovereign immunity must satisfy the traditional summary judgment burden of proof. *Id.* If it does so, the plaintiff must raise a disputed material fact. *Id*. at 281. If a fact issue exists, the plea should be denied. *Id*. If the plaintiff fails to raise a fact issue or the evidence supporting the agency's challenge is undisputed, the plea must be granted. *Id*. As in the summary judgment context, we "take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id*. Yet we "cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not," and "cannot disregard evidence necessary to show context." *Id*.

## B. TCHRA

The TCHRA prohibits employers from discriminating against employees on the basis of "race, color, disability, religion, sex, national origin, or age[.]" Tex. Lab. Code Ann. § 21.051. That is, an employer may not, on such a basis, "fail[] or refuse[] to hire an individual, discharge[] an individual, or discriminate[] in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment[.]" Tex. Lab. Code Ann. § 21.051(1). The prohibition against age discrimination protects individuals 40 years of age or older. Tex. Lab. Code Ann. § 21.101. The prohibition against disability discrimination protects

6

individuals with a physical or mental condition that does not impair the individual's ability to reasonably perform a job with or without reasonable accommodations. Tex. Lab. Code Ann. § 21.105. In adopting the TCHRA, the Legislature "intended to correlate state law with federal law"; accordingly, we may look to federal law to interpret its provisions. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam).

### C. Proving discrimination

Texas courts recognize two alternative methods of proof for TCHRA claims. *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020). First, a plaintiff may prove unlawful discrimination with direct evidence. *Id*. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Tex. Dep't of Aging & Disability Services v. Lagunas*, 618 S.W.3d 845, 852 (Tex. App.—El Paso 2020, no pet.); *Sandstad v. CB Richard Ellis, Inc*., 309 F.3d 893, 897 (5th Cir. 2002).

Second, because direct evidence is often hard to come by, TCHRA plaintiffs are allowed to rely on indirect or circumstantial evidence under the *McDonnell-Douglas* burden-shifting framework. *Tex. Tech*, 612 S.W.3d at 305; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, (1) the plaintiff must establish a prima facie case, which creates a presumption of unlawful discrimination; (2) if such a presumption is created, the defendant must show it had a legitimate, nondiscriminatory reason for its action; and (3) if such a reason is established, the plaintiff must show it was a mere pretext. *Tex. Tech*, 612 S.W.3d at 305.

### III. ISSUES ON APPEAL

DADS raises a single global issue on appeal, arguing that the trial court erred in denying its plea to the jurisdiction as to Gomez's age, gender, and disability discrimination claims.

## IV. DISCUSSION

### A. Age and gender discrimination

A prima facie case of age or sex discrimination is established by producing evidence that the plaintiff (1) is a member of the protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was either (a) replaced by someone outside the protected class, or (b) otherwise treated less favorably than others similarly situated but outside the protected class, *Tex. Tech*, 612 S.W.3d at 305, sometimes referred to as "comparators."[4] *Tex. Dep't of State Health Services v. Resendiz*, 642 S.W.3d 163, 173 (Tex. App.—El Paso 2021, no pet.).

Here, DADS challenges only the fourth element, conceding that Gomez is a member of relevant protected classes (over 40 years old and female), was qualified for her position (Cook II), and suffered an adverse employment action (termination). Gomez does not assert that she was replaced by a person who was under 40 years old or male. Thus, the sole prima facie element at issue is whether Gomez produced evidence that DADS otherwise treated Gomez less favorably than one or more comparators—similarly situated coworkers who were under 40 years old or male.

---

[4] Gomez argues she can alternatively satisfy the fourth element of a prima facie case of age or sex discrimination under the *McDonnell-Douglas* burden-shifting framework with circumstantial evidence she was "otherwise subjected to an adverse employment action because of her protected characteristic," as opposed to evidence she was replaced by someone outside the protected class or otherwise treated less favorably than others similarly situated but outside the protected class. However, the Texas Supreme Court expressly rejected that alternative theory, *see Tex. Tech Univ. HealthScis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 311 n. 12 (Tex. 2020); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 638–42 (Tex. 2012), while noting there is "something of a split" in the federal circuits concerning the alternative theory's viability under federal law. *Garcia*, 372 S.W.3d at 638–39. To the extent we have suggested in past cases that such an alternative theory might be viable, *see, e.g., Tex. Dep't of Aging & Disability Services v. Loya*, 491 S.W.3d 920, 924–25 (Tex. App.—El Paso 2016, no pet.) (holding that fourth element of prima facie case of sex discrimination can be met with circumstantial *evidence plaintiff was "otherwise terminated because of her gender"); Tex. Tech Univ. Health Scis.-El Paso v. Flores*, 587 S.W.3d 831, 839 (Tex. App.—El Paso 2019), *rev'd sub nom. on other grounds*, 612 S.W.3d 299 (Tex. 2020) (holding that fourth element of prima facie case of age discrimination can be met with circumstantial evidence plaintiff was "otherwise subjected to an adverse employment action because of her protected characteristic"), we disapprove that aspect of these cases. Direct evidence cases and disability discrimination cases are not affected by this footnote.

**B. Disability discrimination**

A prima facie case of disability discrimination is established by producing evidence that the plaintiff (1) has a disability; (2) was qualified for the position; and (3) suffered an adverse employment action because of the disability. *El Paso Cnty. Water Imprvmt Dist. No. 1 v. Trevizo*, No. 08-21-00206-CV, 2023 WL 7109919, at *6 (Tex. App.—El Paso Oct. 27, 2023, no pet.).

Here, DADS concedes that Gomez was qualified, but argues that she failed to produce evidence she was terminated because of a disability.[5] To satisfy the third element of a prima facie case of disability discrimination, the plaintiff must produce evidence that he or she suffered an adverse employment action "because of" a disability. *Trevizo*, 2023 WL 7109919, at *6. To meet this element, Gomez argues that she "was treated less favorably than employees outside her protected class, disability," namely, "Campos was clearly treated better and more favorably." Assuming without deciding that comparators are an appropriate means to prove that adverse actions were taken because of a disability, we turn to Gomez's claim that Campos is a comparator who was treated differently.

**C. Gomez fails to raise any evidence of a similarly situated comparator**

Employees are "similarly situated" if their circumstances are comparable "in all material respects, including similar standards, supervisors, and conduct." *Tex. Tech*, 612 S.W.3d at 312. Although such circumstances need not be "identical," they must be "nearly identical." *Id.* Employees with different work rule violations or disciplinary records, for example, are not considered "nearly identical." *Id.*

The sole comparator identified by Gomez is Campos, who she argues is "younger and

---

[5] DADS also challenges whether Gomez has a disability. We need not reach that issue and assume without deciding that she does.

9

male," and was "treated differently" by DADS.[6] Gomez elaborates: "Campos has a history of hostile confrontations with employees in the workplace for which he received no discipline," and "[e]ven after he verbally assaults Gomez, Salas, and other employees in the workplace, the discipline he receives . . . a supposed six-month probationary period, is not written up, monitored by management, or even enforced in any way." Further, Gomez argues, Campos has a "history of dishonesty in the workplace," as shown by a written "first level reminder" Campos received for "misrepresentation of the truth (lying)" in relation to incidents in which "hot plates"—apparently a substitute for regular meals—were served in violation of the Center's rules.

In response, DADS argues that Campos is not a valid comparator, as "a mere verbal altercation clearly does not rise to the same level of seriousness as a physical assault causing injury." We agree that the conduct Gomez attributes to Campos (verbal assault, lying) is not "identical" or "nearly identical" to the conduct attributed to her (physical assault). *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (holding that "physically push[ing]" is more severe than "verbally abus[ing]"; thus, individuals engaging in these two types of conduct are not "similarly situated"); *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 411 (E.D. Pa. 2000), *aff'd*, 29 Fed. Appx. 100 (3d Cir. 2002) ("[I]ntentionally making physical contact with or pushing a co-employee is not the same conduct as verbally abusing a co-employee. Therefore, Mr. Fry and plaintiff are not similarly situated."). Gomez cites no authority to the contrary.

Gomez also argues that Campos, beyond engaging in verbal altercations, also physically assaulted a co-worker. This claim is based on Campos's deposition where he recounts an event

---

[6] We do not address whether Gomez and Campos were similarly situated in all material respects because both parties limit their argument to whether their conduct was comparable.

between he and another co-worker:

Q. And why did you fight Raul Valdez?
A. Because we just wanted to know who was tougher back in those days.
Q. You didn't have an argument with him?
A. No.
Q. It was just, "Hey, let's go fight"?
A. Yes, like the UFC.
Q. Okay. Was it during work hours, or after work hours?
A. During work hours.
Q. Where did you fight?
A. At a break.
Q. Where was that? Like, did you fight on the facility?
A. No. It was over there at Ascarate.
Q. Okay. Have you ever seen Fight Club?
A. Yes. It was kind of like that, yes.

DADS argues that the consensual contact involved in this incident is not "identical" or "nearly identical" to the nonconsensual contact between Gomez and Campos. We agree, and further note that there is no indication DADS received a complaint or was otherwise even made aware of this off-site incident, and while Campos testified Valdez hit him during the fight, Campos was not asked whether he hit Valdez.

Finally, Gomez points to the following "comparator conduct" by Campos, quoting from her rebuttal letter:

Before I start on what really occurred on the date of the altercation (July 30, 2014), let me give you a background on Mr. Robert Campos. . . . Mr. Campos is a person that lets the staff in cottages serve the individuals while he attends to matters at home. He has been involved in many altercations with former and current employees (mainly food service staff). He belittles and has in the past resorted to physical altercations with staff . . . . His behavior and actions are not a secret to food service staff or his supervisor. Prior to the date of the altercation, Mr. Campos was involved in an altercation with Mario Salas (Cook). He also had left the facility early as he normally does without notifying our supervisor (Elinora Montoya) or co-workers[.]

None of the conduct described is "identical" or "nearly identical" to the conduct for which Gomez was terminated, other than "physical altercations with staff," for which no details are

11

provided. Without details, such incidents cannot be considered. *See Hardison v. Skinner*, No. 20-30643, 2022 WL 2668514, at *3 (5th Cir. July 11, 2022) ("[B]arebones statements, with nothing more to support them, are insufficient to establish that . . . conduct that drew the adverse employment decision was nearly identical to [that of a comparator].") (quotation marks omitted); *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 827 (5th Cir. 2022) ("We cannot compare Owens to other [regional sales managers] when she fails to . . . explain why they are similarly situated.").

Without evidence of a valid comparator who was treated more favorably, we conclude that Gomez failed to present evidence in support of the fourth element of a prima facie case for age or sex discrimination, and the third element of the disability claim.

### D. Legitimate, non-discriminatory reason and pretext

Even had Gomez established a prima face case of discrimination, it falters under the next phase of the *McDonnell-Douglas* burden-shifting framework. DADS showed that it had a legitimate, nondiscriminatory reason for terminating Gomez. This in turn required Gomez to show that the reason proffered was a mere pretext. *Tex. Tech*, 612 S.W.3d at 305.

As Gomez acknowledges, DADS claims it terminated her because she physically assaulted Campos. Gomez does not argue that, if true, such a reason would be illegitimate or discriminatory. Nor does she argue that DADS failed to present evidence that it terminated her for this reason (the record contains deposition testimony by DADS Assistant Director of Administration Karen L. McCluskey, so stating). DADS needed to produce nothing more. *See Tex. Health & Hum. Services v. Sepulveda*, 668 S.W.3d 856, 867 (Tex. App.—El Paso 2023, no pet.) ("The employer's burden to provide a legitimate, nondiscriminatory reason for an adverse employment action is one of production, not persuasion, and it involves no credibility assessment"). Thus, Gomez's argument that DADS "did not carry its burden of production at the second stage of the analysis" is misplaced.

12

In claiming pretext, Gomez argues that "[t]he action taken by [DADS] in this case was based on false evidence and cannot be supported by reason," and "the evidence provided by [DADS] is insufficient to demonstrate that Gomez engaged in th[e] alleged act [of physically assaulting Campos]." However, in making this argument, Gomez neither cites the evidence at issue nor explains why it is false, unsupportable by reason, or insufficient. Instead, she merely states in conclusory fashion that "[t]aken as a whole, the evidence raises fact questions regarding whether Appellant's stated reasons for its decision are pretextual, and whether discrimination was a true reason for the employment action." Such an argument is insufficient. *See El Paso Indep. Sch. Dist. v. Portillo*, 661 S.W.3d 512, 546 (Tex. App.—El Paso 2023, pet. denied) ("To preserve error on appeal, the Texas Rules of Appellate Procedure require adequate briefing, which includes making a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see also* Tex. R. App. P. 38.1(i), 38.2(a)(1).

At other points in her brief, however, Gomez touches on these same issues in more detail. In particular, she argues that we can infer that the reason given for terminating her was pretextual because: (1) OIG's investigation was flawed and lacking in that Campos originally claimed Gomez grabbed him by both arms, but six years later testified in his deposition she grabbed him by one arm; (2) Gomez's hands were too weak to leave marks on Campos's arms by grabbing them; and (3) Cynthia Lewis, a DADS human resources representative, advised that the incident at issue was a "he said she said" matter warranting only minor disciplinary action against both parties involved.

But even viewing the evidence in the light most favorable to Gomez, none of these arguments raises a fact issue as to whether the reason DADS gave for terminating Gomez was pretextual. First, even if OIG's investigation was to some degree flawed or lacking, that alone would not be enough to raise a fact issue on pretext. *See Tex. Dep't of State Health Services v.*

13

*Resendiz*, 642 S.W.3d 163, 179 (Tex. App.—El Paso 2021, no pet.) (neither errors nor lack of thoroughness in employer's investigation will, standing alone, raise fact issue that proffered reasons for termination were pretextual); *Tex. Health & Hum. Services Comm'n v. Enriquez*, 642 S.W.3d 21, 41 (Tex. App.—El Paso 2021, no pet.) ("[T]he existence of conflicting evidence [in an investigation underlying an adverse employment action] does not evidence that [an employer's] stated reason [for taking the action] was false or that [the employer] did not believe [the conclusion drawn in the investigation]."); *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1322 n. 12 (10th Cir. 1992) ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."). In analyzing whether the reason given for an adverse employment action is a pretext, the focus is not on whether the action itself was error-free, but on whether the employer relied on its stated reasons, in good faith, in taking the action. *Resendiz*, 642 S.W.3d at 179. Gomez points to no evidence that DADS did not rely in good faith on its stated reason for terminating her.

Second, Gomez's contention that her hands were too weak to leave marks on Campos's arms is based on her own self-serving statements. While she points to medical records documenting that she was being treated for a prior hand injury, Gomez cites nothing in the records which suggests she was incapable of grabbing a person's arms with enough force to leave visible marks, or that the injury affected her grip strength to any one degree. Gomez's own statements do not raise a fact issue as to pretext. *See Forbis v. Exeter Fin., L.L.C.*, No. 22-10193, 2022 WL 17986689, at *5 (5th Cir. Dec. 29, 2022) ("[S]elf-serving statements are insufficient to create a triable issue of fact as to whether [adverse action was taken] because of [unlawful conduct in violation of civil rights law.]"); *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (appellate court will not second-guess employer's decision to disbelieve employee where conflicting evidence exists); *cf. Haverda v. Hays Cnty.*, 723 F.3d 586, 596–97 (5th Cir.

14

2013) (fact issue existed as to pretext element because employee did not "merely disput[e] the underlying facts," but presented independent corroborating evidence).

Third, while Cynthia Lewis characterized the incident at issue as a "he said she said" matter, this initial assessment was based solely on Gomez and Campos's same-day handwritten statements. In contrast, the subsequent OIG investigation was based on interviews with several witnesses and review of various documents. Thus, Lewis's assessment raises no fact issue as to the veracity of DADS's stated reason for terminating Gomez simply because it differs from the assessment made by OIG.

Accordingly, even had Gomez established a prima facie case of discrimination, the trial court would still have erred in denying DADS's plea to the jurisdiction, as DADS proffered a legitimate, nondiscriminatory reason for terminating her, and Gomez failed to raise a fact issue as to whether it was pretextual.

## V. CONCLUSION

For the reasons stated above, we reverse the trial court's denial of DADS's plea to the jurisdiction in relation to Gomez's age, gender, and disability discrimination claims and render judgment dismissing these claims for lack of jurisdiction.

JEFF ALLEY, Chief Justice

August 30, 2024

Before Alley, C.J., Palafox, and Soto, JJ.